Emily Edenshaw-Chafin

P.O. Box 106

Hydaburg, Alaska 99922

(907) 723-7081

emilyedenshaw@hotmail.com

Plaintiff, Pro Se

RECEIVED

MAR 24 2026

CLERK, U.S. DISTRICT COURT
ANCHORAGE, AK

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

Case No.

EMILY EDENSHAW-CHAFIN, Plaintiff,

vs.

XKKF, an Alaska nonprofit corporation,

d/b/a Xaadas Kil Kuyaas Foundation,

LISA KA'ILJUUS LANG, individually,

WENDY K'AH SKÁAHLUWAA TODD, individually,

DOREEN WITWER, individually,

Defendants.

## COMPLAINT FOR VIOLATIONS OF THE EQUAL PAY ACT, ALASKA HUMAN RIGHTS ACT, RETALIATION UNDER THE FLSA AND AKHRA, AND UNPAID WAGES UNDER THE FAIR LABOR STANDARDS ACT

## JURY TRIAL DEMANDED

---

## I. INTRODUCTION

COMES NOW Plaintiff Emily Edenshaw-Chafin ("Plaintiff" or "Ms. Edenshaw-Chafin"), appearing pro se, and brings this action against Defendants Xaadas Kil Kuyaas Foundation ("XKKF"), Lisa Ka'iljuus Lang ("Lang"), Wendy K'ah Skáahluwaa Todd ("Todd"), and Doreen Witwer ("Witwer"), for violations of the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA"), the Alaska Human Rights Act, AS 18.80.220 ("AKHRA"), unlawful retaliation under 29 U.S.C. § 215(a)(3) (FLSA anti-retaliation provision) and AS 18.80.220, and unpaid wages under the Fair Labor Standards Act, 29 U.S.C. §§ 206-207 ("FLSA").

Although the EEOC dismissed Plaintiff's charge on the basis that XKKF is a "tribal entity" exempt from EEOC jurisdiction (see Exhibit B), that administrative determination does not preclude this federal civil action. As set forth fully in Section II(A) below, XKKF is a separately incorporated Alaska nonprofit corporation, legally distinct from the Hydaburg Cooperative Association ("HCA"), the federally recognized Haida tribe in Alaska. XKKF does not share HCA's sovereign immunity and is fully subject to the jurisdiction of this Court.

Plaintiff is a highly accomplished and uniquely qualified Haida language instructor — widely recognized as having produced the only first-language fluent first language birth speaker of Xaad Kil born in approximately 90 years, holds a Master of Arts in Linguistics of a First Nations Language from Simon Fraser University (2019), is completing a Doctor of Philosophy in Indigenous Studies at the University of Alaska Fairbanks, and has studied Xaad Kil for over 22 years. Despite this extraordinary and irreplaceable expertise, Defendants offered Plaintiff significantly less compensation than a male comparator performing substantially equal or lesser work under the same Sealaska Language Fund grant. When Plaintiff engaged in protected activity — asserting that as an Indigenous woman she was paid fifty cents on the dollar compared to a less qualified male instructor — Defendants retaliated by terminating her contract and forcing her constructive resignation from her position. This action seeks to remedy those unlawful acts.

Plaintiff brings this action to enforce important federal and state wage and civil rights protections. Under the Fair Labor Standards Act and Equal Pay Act, a prevailing plaintiff is entitled to recover reasonable attorney's fees and litigation costs in addition to damages. See 29 U.S.C. § 216(b). Because fee-shifting is mandatory under these statutes, the cost of litigating this matter through discovery, motion practice, and trial may substantially exceed the underlying wage damages at issue.

## II. JURISDICTION, VENUE, AND TRIBAL IMMUNITY

### A. XKKF Is Not Entitled to Tribal Sovereign Immunity

1a. The EEOC dismissed Plaintiff's administrative charge, Case No. NRTS-551-2026-01192, on the ground that Defendant XKKF is a "tribal entity" exempt from EEOC jurisdiction. Plaintiff respectfully submits that this characterization is legally incorrect and does not bar this federal civil action.

1b. Defendant XKKF — Xaadas Kil Kuyaas Foundation — is a nonprofit corporation organized and existing under the laws of the State of Alaska. It is a separately incorporated legal entity, distinct from the Hydaburg Cooperative Association ("HCA"), the federally recognized Haida tribe operating in Hydaburg, Alaska. The Hydaburg Cooperative Association is the federally recognized sovereign tribal entity; XKKF is not.

1c. Tribal sovereign immunity extends to the tribe itself and, in some circumstances, to entities that are true "arms of the tribe" — entities created by tribal resolution, controlled by the tribe, and performing core governmental functions. Courts apply a multi-factor test to determine whether an entity qualifies as an arm of the tribe for immunity purposes. See Cook v. AVI Casino Enterprises, Inc., 548 F.3d 718 (9th Cir. 2008).

1d. XKKF does not qualify as an arm of the HCA. Upon information and belief: (i) XKKF was not created by tribal resolution of the Hydaburg Cooperative Association; (ii) XKKF is governed by its own independent Board of Directors, not by the HCA tribal council; (iii) XKKF is incorporated under Alaska state nonprofit corporation law, not tribal law; (iv) XKKF performs cultural and language revitalization activities — not core governmental functions of the HCA — and is not a political subdivision of the tribe; and (v) XKKF's registered agent and mailing address reflect an independent organizational identity separate from HCA.

1e. XKKF's own Articles of Incorporation — filed with the State of Alaska — further confirm its independent corporate character. Specifically, Article XIV of XKKF's Articles of Incorporation expressly provides that no person shall be excluded from or discriminated against with respect to employment by XKKF. This anti-discrimination provision was adopted by XKKF as part of its foundational governing documents and is binding on the organization and its officers and directors. By paying Plaintiff — an Indigenous woman — significantly less than her male comparator for substantially equal work, Defendants violated not only federal and state anti-discrimination law, but XKKF's own Articles of Incorporation. (See Exhibit N, XKKF Articles of Incorporation, Article XIV.)

1f. The EEOC's administrative dismissal is not binding on this Court. The determination that XKKF is a "tribal entity" for EEOC administrative jurisdiction purposes does not resolve the distinct legal question of whether XKKF qualifies as an arm of a federally recognized tribe entitled to sovereign immunity in federal civil litigation. This Court conducts its own independent analysis. Plaintiff respectfully submits that XKKF is not entitled to tribal sovereign immunity, and that this Court has full jurisdiction over all claims herein.

B. Federal Question Jurisdiction and Venue

1. This Court has federal question jurisdiction over Plaintiff's Equal Pay Act and Fair Labor Standards Act claims pursuant to 28 U.S.C. § 1331, as these claims arise under the laws of the United States.

2. This Court has jurisdiction over Plaintiff's Equal Pay Act claims pursuant to 29 U.S.C. § 216(b), which provides for a civil action in any court of competent jurisdiction.

3. This Court has supplemental jurisdiction over Plaintiff's Alaska Human Rights Act and state law claims pursuant to 28 U.S.C. § 1367, as those claims are so related to the federal claims that they form part of the same case or controversy.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the unlawful employment practices and acts complained of herein occurred within the District of Alaska, Defendant XKKF is organized and operates within this district, and the individual Defendants reside and/or conduct business within this district.

## III. PARTIES

5. Plaintiff Emily Edenshaw-Chafin is a resident of the State of Alaska and a member of the Hydaburg Cooperative Association. She is one of the foremost living experts in Xaad Kil, the Haida language, and is widely credited as having produced the only fluent first language birth speaker of Xaad Kil in several decades. At all relevant times, Plaintiff performed services for Defendant XKKF as a language instructor and content developer.

5a. In addition to her role as a paid language instructor, Plaintiff also served in a voluntary, unpaid leadership capacity within XKKF. Specifically, at XKKF's formal reorganizational meeting held on June 7–8, 2023, Plaintiff was unanimously elected Vice President of XKKF by the Board of Directors, as documented in XKKF Resolution 2023-1 and the Minutes of the First Re-Organizational Meeting of the Board of Directors. Plaintiff served in this capacity through October 2, 2025, when she voluntarily resigned only her unpaid VP role — not her paid contractor role — following Defendant Lang's retaliatory conduct. This dual role — as both a compensated instructor and an elected organizational leader — further demonstrates the depth and breadth of Plaintiff's contributions to XKKF, contributions that were not reflected in her compensation relative to the male comparator instructor.

6. Defendant XKKF is an Alaska nonprofit corporation legally registered under the name XKKF and doing business as Xaadas Kil Kuyaas Foundation, organized under the laws of the State of Alaska and operating in the District of Alaska. XKKF is dedicated to the preservation, reclamation, and continuation of the Haida language and culture. XKKF received a grant from the Sealaska Language Fund, which funded the instructor positions at issue in this matter. At all relevant times, XKKF employed and/or engaged Plaintiff within the meaning of the Fair Labor Standards Act and the Alaska Human Rights Act, AS 18.80.220.

7. Defendant Lisa Ka'iljuus Lang ("Lang") is, upon information and belief, a resident of Alaska and served as the Executive Director of XKKF at all times relevant to this action. Lang was responsible for issuing contracts, negotiating compensation, and day-to-day management of XKKF operations, including the engagement of language instructors under the Sealaska grant. Lang is sued individually.

8. Defendant Wendy K'ah Skáahluwaa Todd ("Todd") is a resident of Alaska, holds the position of Term Assistant Professor of Indigenous Science at the University of Alaska Southeast, Juneau Campus, and served as President of XKKF at all relevant times. Todd had authority over contract approvals, board-level compensation decisions, and organizational policy. Todd co-signed the retaliatory termination letter demanding repayment from Plaintiff. Todd is sued individually.

9. Defendant Doreen Witwer ("Witwer") is, upon information and belief, a resident of Alaska and served as Treasurer of XKKF at all relevant times. Witwer is also the registered agent of XKKF, with a registered mailing address of P.O. Box 25, Hydaburg, AK 99922. Witwer co-signed the retaliatory termination letter demanding repayment from Plaintiff and threatening legal action. Witwer is sued individually.

## IV. EMPLOYMENT STATUS — PLAINTIFF AS EMPLOYEE

10. Although XKKF designated Plaintiff as an "independent contractor," the economic reality of the relationship demonstrates that Plaintiff was an employee within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 203(e), and the Alaska Human Rights Act. Federal courts apply the "economic realities test" to determine whether a worker is an employee or a contractor, looking beyond the label in any written agreement to the true nature of the working relationship. Applying that test here, Plaintiff was an employee of XKKF.

11. Degree of Control: XKKF controlled the manner and means by which Plaintiff performed her work, including: (i) specifying the days of classes (Saturdays and Sundays, 10:00–11:00 AM Alaska time, and Tuesday/Thursday evening grammar classes); (ii) mandating the specific platform to be used (Zoom video conferencing); and (iii) determining the subject matter to be taught. Notably, XKKF required Plaintiff to use Zoom as the instructional platform but failed to provide a paid Zoom account for this purpose. Plaintiff was compelled to use her own University of Alaska Fairbanks institutional Zoom account to conduct XKKF classes — subsidizing

Case 3:26-cv-00135-ACP    Document 1    Filed 03/24/26    Page 5 of 36

12. Integration into Core Operations: Plaintiff's services were integral to XKKF's core organizational mission — Xaad Kil language preservation and instruction. Plaintiff was publicly listed on XKKF's website as Vice President of the organization, was formally recognized in XKKF's official board minutes and resolutions, represented XKKF at community events, and was presented with a ceremonial cedar hat by XKKF leadership in recognition of her credentials and service. Her role was not that of an outside vendor; she was a central, publicly identified figure in XKKF's organizational identity.

13. Economic Dependence: For a substantial period, XKKF was Plaintiff's primary and sole source of earned income. Plaintiff resides in rural Alaska — a region characterized by exceptionally high costs of living, geographic isolation, and limited employment alternatives — and depended on XKKF income to meet her basic living expenses, including feeding her children. This economic dependence on a single organization is a hallmark of an employment relationship, not the independence characteristic of a true independent contractor operating a separate business.

14. Permanency of Relationship: Plaintiff's relationship with XKKF spanned from 2022 through October 2025 — approximately three and a half years of continuous, recurring engagement across multiple consecutive contract cycles. This long-term, permanent, recurring relationship is characteristic of employment, not sporadic or project-specific contractor engagements.

15. Lack of Independent Business: Plaintiff had no opportunity for profit or loss independent of XKKF's decisions; her compensation was a fixed sum determined entirely by XKKF and its board. Plaintiff did not hold herself out as operating an independent language instruction business serving multiple clients during the relevant periods. While Plaintiff later obtained a UAF position to support her doctoral work, that academic appointment was distinct from and supplemental to her XKKF engagement and does not transform the XKKF relationship into an independent contractor arrangement.

15a. XKKF required Plaintiff to submit a signed agreement and updated W-9 form before receiving payment — indicating an ongoing formal payment relationship — and directed the specific outputs, timing, and platform of Plaintiff's work, leaving Plaintiff with no meaningful independence in how she performed her contracted duties. Plaintiff did not operate an independent business, did not advertise services to the public, and did not perform comparable language instruction work for multiple clients during the relevant period.

16. Enterprise Coverage: Upon information and belief, XKKF receives interstate funding and grant funds, including from the Sealaska Language Fund based in Juneau, Alaska, engages in interstate communications, and coordinates with language programs and institutions across state lines. XKKF conducted programming and collaborative activities across state lines, including engaging instructors located in other states and participating in regional language events outside Alaska. XKKF therefore constitutes an enterprise engaged in commerce or in the production of goods for commerce within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 203(s)(1).

16a. Individual Coverage: At all relevant times, Plaintiff was an employee engaged in interstate commerce within the meaning of the Fair Labor Standards Act. Plaintiff's work for XKKF included communications with out-of-state entities, participation in interstate travel for program activities, and work connected to grant-funded language revitalization programs involving interstate organizations, including travel to the Lummi Nation in Washington. Accordingly, Plaintiff is individually covered by the FLSA pursuant to 29 U.S.C. §§ 203 and 206.

17. Under the FLSA, employee status is determined by the "economic reality" of the relationship rather than contractual labels. Tony & Susan Alamo Foundation v. Secretary of Labor, 471 U.S. 290 (1985). Applying the economic reality test in its entirety, Plaintiff was an employee of XKKF for purposes of the EPA, FLSA, and the Alaska Human Rights Act, AS 18.80.220. The label of "independent contractor" in XKKF's written agreements does not control; the economic reality of control, integration, dependence, and permanency establishes an employment relationship as a matter of law.

## V. STATEMENT OF FACTS

### A. Chronological Overview of Key Events

18. The following verified timeline reflects the documented sequence of events giving rise to this complaint:

    a. March 14, 2025 — XKKF Executive Director Lisa Ka'iljuus Lang issues a strong reference letter praising Plaintiff's professionalism, teaching skill, and critical importance to the language program;

    b. April 2025 — XKKF board leadership publicly praises Plaintiff on Facebook, affirming her positive standing in the organization;

    c. May 2025 — XKKF leadership presents Plaintiff with a hand-woven traditional Haida cedar hat honoring her academic achievements and service to Haida language revitalization;

d. July 25, 2025 — XKKF board minutes reflect a fully positive relationship with Plaintiff; no performance concerns are raised;

e. August 15–17, 2025 — Plaintiff volunteers all three days at the Hydaburg Culture Camp, running the Haida Language Table, distributing free Haida books, teaching community members, and enrolling participants in XKKF's Naana's Club — entirely unpaid;

f. September 3, 2025 — Plaintiff messages board member Robert Yates regarding the teaching role and low contract pay; no concerns about her conduct are raised;

g. September 30, 2025 — Plaintiff signs new $6,000 contract at Defendant Lang's home; no electronic copy provided; October 6, 2025 start date specified;

h. October 1, 2025 — Plaintiff engages in protected activity at XKKF-sponsored event in Kasaan, discussing wage inequity with Ari Halpern;

i. October 2, 2025 — Defendant Lang retaliates the very next morning; Plaintiff resigns only her voluntary VP role (NOT her contractor role); another contractor discloses Plaintiff's wages were improperly discussed;

j. October 2–3, 2025 — Board member Robert Yates responds to Plaintiff's messages supportively in Haida, validating her experience;

k. October 6, 2025 — Plaintiff begins teaching under the contract, fulfilling all duties;

l. October 8, 2025 — Plaintiff sends written letter to XKKF documenting retaliation and clarifying she never resigned her contractor role;

m. Late 2025 — XKKF issues incomplete termination letter (Page 1 missing); Page 2 references bylaws requiring due process that was never provided.


B. The Sealaska Language Fund Grant and Instructor Budget


20. In or around 2024–2025, XKKF received a grant from the Sealaska Language Fund for the purpose of supporting Haida language instruction, reclamation, and preservation.


21. The Sealaska Language Fund grant budget allocated $10,000 for the language instructor position. (See Exhibit C, Sealaska Language Fund RFP, attached hereto, reflecting XKKF's own budgeted compensation for the instructor role.)


22. Upon information and belief, the grant budget specifically contemplated the instructor position as a single line item of $10,000, representing full compensation for the contracted instructor's services. XKKF's own grant proposal to Sealaska therefore establishes the organization's internal awareness of the fair market rate for the instructor position — the very rate denied to Plaintiff. (See Exhibit C.)

## C. Plaintiff's Qualifications and Unique Cultural Contributions

23. Plaintiff Emily Edenshaw-Chafin (Haida name: Kihl Gúul Jáad) is a uniquely qualified Xaad Kil instructor with over 22 years of continuous study and practice. She holds four completed academic degrees and certificates in Xaad Kil and linguistics, including a Master of Arts in Linguistics of a First Nations Language from Simon Fraser University (2019) and graduate certificates in Field Methods in Linguistics and Documentation and Description of Endangered Languages. She is completing a PhD in Indigenous Studies at the University of Alaska Fairbanks focused on Xaad Kil recordings from 1943 — making her one of only two doctoral researchers in the world dedicated to Northern Haida linguistic heritage — the other being Dr. Jaskwaan in Masset, Haida Gwaii, Canada, whose work focuses on the Masset dialect, a distinct but related variety of Northern Haida. She is widely recognized within the Haida language community as having produced the only fluent first language birth speaker of Xaad Kil born in approximately 90 years — a remarkable and irreplaceable achievement given that Xaad Kil is critically endangered with fewer than 5 known fluent first language birth speakers remaining. Plaintiff's commitment to Xaad Kil language revitalization is not merely academic or professional — she has raised the language in her own home, making her the mother of the only known fluent first language birth speaker of Alaskan Haida living today.

24. Plaintiff's son is the only fluent first language birth speaker of Alaskan Haida living today. Intergenerational transmission — the passing of a language from parent to child as a native, fluent first language birth speaker — is widely recognized by linguists and language revitalization scholars as the single most critical factor in the survival of a highly endangered language. Without living fluent first language birth speakers, a language cannot be revitalized; it can only be documented. Plaintiff has accomplished what no other Alaskan Haida speaker has: she has created a living intergenerational speaker. This extraordinary and irreplaceable achievement means that XKKF derived unique cultural capital from its association with Plaintiff and her family, including her son's participation in ceremonial and cultural events on behalf of the organization — capital that cannot be replicated by any other contractor, employee, or consultant.

25. Among these cultural contributions, Plaintiff's son participated in ceremony at Lummi on behalf of XKKF — a participation that conferred significant cultural legitimacy and visibility upon the organization within Indigenous communities across the Pacific Northwest. XKKF received this benefit without providing Plaintiff any additional or equitable compensation.

## D. Off-Contract Labor — Months of Unpaid Work Prior to Contract Issuance

26. Prior to the issuance of any written contract for the Summer/Fall 2025 program period, both Plaintiff and male comparator Ryan Kessler performed work on behalf of XKKF's Haida language program without compensation. XKKF directed and benefited from this off-contract labor for several months before formalizing any contractual arrangement.

27. When contracts were finally issued, XKKF offered Plaintiff $5,000 — 50% of what the Sealaska grant budget allocated for the instructor position, and 50% of what Ryan Kessler received — despite the fact that Plaintiff had performed equal or greater unpaid off-contract work during the same preceding period.

E. Plaintiff's Community Outreach — Hydaburg Culture Camp and Lummi

28a. On August 15, 16, and 17, 2025, Plaintiff attended and worked at the Hydaburg Culture Camp for all three days. During the culture camp, Plaintiff:

   a. Staffed an XKKF table representing the organization to the Haida community;
   b. Recruited prospective students and signed up community members for upcoming Xaad Kil classes;
   c. Distributed XKKF's Haida language materials to community members;
   d. Served as the public face of XKKF's language revitalization program in Hydaburg.

28b. Plaintiff received no compensation for her three days of work at the Hydaburg Culture Camp. This work directly benefited XKKF by building enrollment for the upcoming class session and expanding the organization's presence in the Haida community.

28c. Male comparator Ryan Kessler was not present at the Hydaburg Culture Camp. He performed no comparable community outreach on behalf of XKKF. The only person who staffed XKKF's community presence at the Hydaburg Culture Camp was Plaintiff.

28d. Plaintiff also traveled to Lummi at her own personal expense to represent XKKF and the Haida language program. Plaintiff was not reimbursed for this travel. Ryan Kessler did not attend or represent XKKF at Lummi.

F. Three Months of Off-Contract, Unpaid Labor

29. Beginning in July 2025 and continuing through September 30, 2025, Plaintiff performed substantial work for XKKF without any contract or compensation. It was common practice and organizational expectation at XKKF for contractors to work off-contract, and XKKF knowingly suffered and permitted this work to occur.

30a. Upon information and belief, both Plaintiff and male comparator Ryan Kessler regularly performed work for XKKF outside of formal contract periods, with contracts sometimes executed after work had already commenced. This practice was common knowledge within the organization and reflects an ongoing employment relationship beyond the written contract terms. This pattern repeated across multiple contract cycles, further establishing the regular and continuous nature of the employment relationship between Plaintiff and XKKF.

31. During this three-month off-contract period, Plaintiff attended bi-weekly organizational meetings with Ryan Kessler every Tuesday and Thursday evening for approximately two hours per session. Plaintiff and Kessler attended the same meetings, performing identical preparatory and organizational work side by side. Kessler ultimately received a contract for $10,000. Plaintiff ultimately received a contract for $6,000 — for the same prior period of unpaid parallel labor.

32. During the off-contract period, Plaintiff attended the following organizational meetings:

a. July 2025: approximately eight (8) Tuesday/Thursday evening meetings — approximately 16 hours of uncompensated labor;

b. August 2025: approximately eight (8) Tuesday/Thursday evening meetings — approximately 16 hours of uncompensated labor, in addition to the three-day Hydaburg Culture Camp (August 15–17, 2025);

c. September 2025 (through September 30): approximately four (4) meetings — approximately 8 hours of uncompensated labor.

33. In total, Plaintiff performed approximately 70 or more hours of uncompensated labor for XKKF during July, August, and September 2025, before any contract was offered. XKKF accepted the full benefit of this labor without compensation.

G. XKKF's Formal Recognition of Plaintiff's Qualifications

34. In May 2025 — just four months before Defendant Lang offered Plaintiff 50% of the compensation paid to Kessler — XKKF formally honored Plaintiff with a traditional woven cedar hat in recognition of the Haida language degrees and certificates Plaintiff earned that month. The presentation of a cedar hat is a meaningful and formal recognition in Haida culture, signifying achievement and distinguished standing in the community.

34a. As recently as July 22, 2025 — just ten weeks before her termination — Plaintiff represented XKKF at the 60th International Conference on Salish and Neighbouring Languages (ICSNL), held at the University of the Fraser Valley Chilliwack Campus in Chilliwack, British Columbia, Canada. Plaintiff attended in her capacity as Vice President of XKKF and personally introduced co-authors Nathan Bennett, Morris Alpor, and Sarah Basu at the opening of their XKKF-affiliated paper presentation — a paper co-authored by Wendy Todd, Stephanie Verlaine

35. This ceremonial recognition demonstrates that XKKF was fully aware of Plaintiff's superior qualifications and expertise at the time the discriminatory contract was offered. XKKF cannot credibly claim ignorance of Plaintiff's qualifications when it formally and publicly honored those very credentials mere months before the discriminatory pay decision.

36. Dr. Alice Taff, a specialist in Southeast Alaska Indigenous languages and a member of Plaintiff's doctoral committee at the University of Alaska Fairbanks, has recognized Plaintiff as the world's leading expert on Xaad Kil. This recognition from a credentialed academic specialist in the field further establishes the superior qualifications Plaintiff brought to her work at XKKF relative to the male comparator.

H. Contracted Services

37. Pursuant to a written contract, Plaintiff agreed to provide the following services for XKKF: (a) teach beginning Xaad Kil (Haida language) classes via Zoom on Saturdays and Sundays from 10:00–11:00 AM Alaska time; (b) participate in Tuesday and Thursday evening grammar classes; and (c) provide technical support for updating the XKKF website.

37a. Plaintiff's 2025 contract also required her to organize and put on two community Naana's Club events in addition to her teaching duties. Although Plaintiff fulfilled the teaching component of her contract in full, the hostile work environment created by Defendants made it impossible for Plaintiff to carry out the community events obligation. The same retaliatory and exclusionary conduct by XKKF leadership and individuals connected to the organization that drove Plaintiff to walk seven miles out of Kasaan alone on a dirt road rendered her participation in XKKF community events untenable. To the extent XKKF asserts that Plaintiff failed to fully perform her 2025 contract, that failure was directly and proximately caused by the hostile environment Defendants themselves created — a hostile environment that was itself the product of Plaintiff's protected activity on October 1, 2025.

37b. Although Plaintiff's contracts described her role in Ryan Kessler's Tuesday and Thursday classes as merely "attending," Plaintiff in practice functioned as a full teaching assistant. Plaintiff's actual duties included taking attendance, sending post-class surveys, managing student registration, creating registration forms and promotional materials, troubleshooting technical issues for students, sending reminder emails, responding to student inquiries, and assisting students in understanding Kessler's teachings. For the Fall 2025 contract period, Plaintiff negotiated the removal of this teaching assistant role, which XKKF had initially requested, due to the extraordinary time commitment it would require and her need to complete her doctoral dissertation. These duties were never reflected in Plaintiff's compensation and were not required of Kessler — who had the full benefit of Plaintiff's administrative and instructional support while receiving 50% more pay.

38. Plaintiff performed these services faithfully and with distinction. In addition to her contracted duties, Plaintiff developed original instructional materials and curriculum, including unique language resources she created and refined over years of dedicated study and practice.

39. Plaintiff's weekend language classes were attended by members of the Haida community. (See Exhibit A, Facebook post referencing "Xaad Kíl on the weekends.")

40. XKKF entered into two contracts with Plaintiff during 2025. The Spring 2025 contract (XKKF CONTRACT EMILY 2025, Exhibit I) covers January through June 2025 and reflects a total compensation amount of $5,000 — just 50% of the $10,000 grant budget allocated for the instructor position. The Fall 2025 contract, covering approximately October through December 2025, was signed at Defendant Lang's home on September 30, 2025, and reflects a total compensation amount of $6,000 — just 60% of the $10,000 grant budget. No electronic copy of the Fall 2025 contract was provided to Plaintiff at signing. Together, these two contracts demonstrate a consistent and ongoing pattern of compensating Plaintiff below the grant-budgeted rate across both 2025 contract periods.

41. XKKF's 2024 contract with Plaintiff (XKKF CONTRACT EMILY 2024) reflects total compensation of $10,000 — the same amount paid to male comparator Ryan Kessler during the same period. The Fall 2024 contract period represents the only time in Plaintiff's engagement with XKKF that she was compensated on par with her male counterpart. The pay disparity that forms the basis of this action emerged in 2025, when XKKF offered Plaintiff $5,000 for the Spring 2025 contract period and $6,000 for the Fall 2025 contract period, while continuing to pay Kessler $10,000 — despite Plaintiff having demonstrated superior qualifications, performed greater unpaid community labor, and having been formally recognized by XKKF itself for her achievements just months earlier.

I. The Male Comparator — Ryan Kessler

42. Upon information and belief, XKKF engaged Ryan Kessler ("Kessler"), a male contractor, for a language instructor or related position funded through the same Sealaska Language Fund grant or comparable organizational funds.

43. Upon information and belief, Kessler was paid or offered $10,000 — the full grant-budgeted amount — for his instructor position. Kessler is the appropriate comparator for Plaintiff's Equal Pay Act claim because he performed substantially the same language instructor duties as Plaintiff under the same grant, during the same period, for the same organization. Critically, Kessler has consistently received $10,000 per contract — automatically, without negotiation — throughout his entire engagement with XKKF. By contrast, Plaintiff was required to negotiate upward from below-market opening offers in every contract cycle. During the course of her engagement with XKKF, Plaintiff was present at a meeting in which Kessler himself stated that he deliberately limited his contract amounts to $10,000 in order to protect his California Medicaid eligibility — confirming that XKKF would willingly pay him more if he requested it. This statement, made in

43a. Plaintiff's contracts expressly included the creation and maintenance of the "Children's Corner" — a collection of Haida language educational resources for children, published on XKKF's website. On April 18, 2024, during the course of her contractual engagement with XKKF, Plaintiff created "Tracing Tláng Glaláang náay aa" — a Haida learning resource bearing her Haida name, Kihl Gúul Jáad Edenshaw-Chafin, as creator. No comparable deliverable was required of, or incorporated into the contract of, male comparator Ryan Kessler. Plaintiff therefore performed substantially greater scope of work than her male comparator while receiving equal or lesser compensation — a disparity that further evidences sex-based wage discrimination in violation of the Equal Pay Act, 29 U.S.C. § 206(d). The Children's Corner resources, including "Tracing Tláng Glaláang náay available on XKKF's website at https://xkkf.org/offerings as of the date of this filing, demonstrating XKKF's continued benefit from Plaintiff's contracted work. (See Exhibit D, Tracing Tláng Glaláang náay aa, attached hereto; see also Exhibit E, website, attached hereto.)

44. Critically, Ryan Kessler performed less community work than Plaintiff for more pay. Specifically:

a. Ryan Kessler was not present at the Hydaburg Culture Camp on August 15, 16, or 17, 2025. Plaintiff staffed XKKF's community outreach table alone for all three days without any compensation;

b. Ryan Kessler did not travel to Lummi to represent XKKF or the Haida language program. Plaintiff did, paying all travel expenses out of her own pocket without reimbursement;

c. Ryan Kessler did not recruit students or distribute XKKF language materials in the Haida community prior to the 2025 class session. Plaintiff did all of this uncompensated;

d. Ryan Kessler's family contributed no comparable cultural assets to XKKF. Plaintiff's son — the only fluent first language birth speaker of Alaskan Haida — participated in ceremony and cultural events on behalf of XKKF, lending the organization irreplaceable cultural credibility in Indigenous communities.

44a. In addition to the above, Plaintiff created video content for the Foundation, including a Halloween video released and posted on October 22, 2024, and an Easter video released and posted on April 12, 2025, both bearing the Foundation's name. These videos were created collaboratively with the male comparator instructor Ryan Kessler — with Plaintiff and Kessler working together on the content and wording — and were integrated into official XKKF programming and shown in Foundation classes. Plaintiff created, produced, and distributed these videos on her own personal social media accounts, as XKKF did not maintain its own official social media presence and relied on contractors' personal platforms for organizational outreach. Plaintiff received no additional compensation for this creative and promotional work, despite its official organizational character and direct benefit to XKKF. Ryan Kessler received no reduction in pay for contributing less to the production of this content.

44b. Throughout her engagement with XKKF, Plaintiff personally paid for a Canva subscription out of pocket, which she used to create XKKF instructional books, video resources, class posters, and other organizational materials used directly in XKKF programming. Plaintiff disclosed her use of this tool on multiple occasions during XKKF meetings and demonstrated the platform to other instructors and leadership. Plaintiff's Canva subscription receipts document monthly charges of $15.00 and an annual renewal of $120.00, with documented payments from May 2024 through March 2025 totaling $284.97 in unreimbursed expenses. Plaintiff received no reimbursement for this subscription at any time. Upon information and belief, the male comparator instructor Ryan Kessler did not bear comparable out-of-pocket expenses for the creation of XKKF materials. This disparity — in which Plaintiff bore the personal cost of tools used to benefit XKKF while receiving lower compensation than the male comparator — further reflects the unequal treatment of Plaintiff throughout her engagement with the organization.

44c. Upon information and belief, Executive Director Lisa Ka'iljuus Lang billed XKKF $10,000 through her personal consulting company, Lisaverosh Consulting, during the 2024 grant period. The services billed under this contract were for a potlatch that Lang organized in Lummi territory in honor of her late mother — a personal family bereavement event, not a core organizational program comparable to Plaintiff's language instruction and curriculum development work. Lang, as Executive Director, approved her own contract — a textbook example of organizational self-dealing. Furthermore, Lang regularly directed paid XKKF contracts to her own sisters — Sandi Granberry and Verlaine Edenshaw — and other family members, establishing a documented pattern of nepotism and preferential treatment that benefited Lang's personal network at the direct expense of non-family contractors like Plaintiff, who was repeatedly paid below the grant-budgeted rate while Lang's family members were consistently engaged.

The Lisaverosh contract is not offered as a direct pay comparator under the Equal Pay Act — the work performed was not substantially equal to Plaintiff's language instruction duties — but is offered as powerful evidence of the following:

(i) Pretext: XKKF's stated financial justifications for Plaintiff's lower compensation were pretextual. The organization had sufficient funds to pay Lang $10,000 for a personal family potlatch and to direct additional contracts to Lang's sisters, while simultaneously paying its primary language specialist — the world's leading expert on Xaad Kil — below the grant-budgeted amount.

(ii) Retaliatory Motive: Lang terminated Plaintiff within one day of Plaintiff's protected compensation activity while simultaneously enriching herself and her family members through organizational funds. This pattern of self-dealing demonstrates that Lang's stated justifications for Plaintiff's lower pay — including the claim that Kessler would "teach for free" — were pretextual rationalizations designed to suppress Plaintiff's compensation, not legitimate business reasons.

(iii) Organizational Culture of Disparate Treatment: The documented pattern of self-dealing and family-directed contracting reflects an organizational culture in which those personally connected to leadership received financial benefit, while Plaintiff — who raised concerns about equitable compensation — was paid below the grant-budgeted rate and ultimately terminated for asserting her rights.

45. Defendant Lang explicitly compared Plaintiff to Kessler during contract negotiations, stating that Kessler would teach for free and teaches double the hours — a comparison designed to justify paying Plaintiff less, not a legitimate business justification. This stated justification is pretextual: Plaintiff performed substantially more community outreach work than Kessler before any class session began, held significantly superior academic qualifications, and had been formally honored by XKKF itself for those same credentials just months earlier.

46. The pay disparities documented in Plaintiff's case are as follows:

   a. Sealaska grant budget for instructor position: $10,000
   b. Amount offered to male comparator Ryan Kessler: $10,000
   c. Amount offered to Plaintiff Emily Edenshaw-Chafin (2025 contract): $6,000
   d. Pay disparity: $4,000 (40% less than male comparator)

47. This disparity is not explained by any factor other than sex. Plaintiff's qualifications exceed those of the male comparator in every measurable respect. Plaintiff is the preeminent living Xaad Kil instructor and has achieved results — producing a fluent first language birth speaker — that no other instructor has matched.

47a. During contract negotiations for the Fall 2025 contract, XKKF President Wendy K'ah Skáahluwaa Todd expressly acknowledged the pay disparity between Plaintiff and her male comparator. President Todd offered to pay Plaintiff an additional $4,000 from outside XKKF — believed to be from grant funds associated with President Todd's separate employment at the University of Alaska Southeast, where she holds a position and maintains an NSF grant — in order to close the gap. Plaintiff declined this offer because she had been specifically promised that her compensation would be drawn from the Sealaska Language Fund grant — the same grant that funded her male comparator's $10,000 payment — and sought only to be paid equitably from that same funding source. That XKKF's own president sought to remedy the disparity from personal outside funding — rather than from XKKF resources — confirms that the organization itself never intended to correct the unequal compensation. President Todd's acknowledgment of the pay disparity and her offer to remedy it confirms that the unequal compensation was known, intentional, and not the result of any legitimate nondiscriminatory factor. XKKF cannot now claim the pay disparity was accidental or justified when its own president sought to remedy it during negotiations.

Case 3:26-cv-00135-ACP     Document 1     Filed 03/24/26     Page 16 of 36

48. Defendant Lang's stated justification — that Kessler would work for free and taught more hours — is pretextual. No legitimate business reason supports paying Plaintiff, the most accomplished Xaad Kil instructor living today, 40% less than a male counterpart for the same grant-funded instructor position.

J. Plaintiff's Protected Activity and Retaliation

49. On September 3, 2025, Plaintiff messaged XKKF board member Robert Yates regarding the potential teaching role, noting the contract's low pay. No concerns about her performance or behavior were raised at that time. Plaintiff continued performing off-contract work through September 30, 2025.

50. On September 30, 2025, Plaintiff signed the new $6,000 teaching contract at Defendant Lang's home. No electronic copy of the contract was provided to Plaintiff. The contract specified an October 6, 2025 teaching start date.

51. In approximately October 2025, Plaintiff raised concerns about unequal compensation between herself and a male instructor performing substantially similar work. Plaintiff discussed these concerns with community members, including Ari Halpern, who is associated with individuals connected to the Foundation. Shortly thereafter, individuals involved with the Foundation became aware of Plaintiff's concerns regarding pay disparity. Following this disclosure, Plaintiff experienced escalating hostility and adverse actions culminating in termination of her contract.

51a. Specifically, on October 1, 2025, at an XKKF-sponsored event in Kasaan, Plaintiff engaged in protected activity by discussing wage inequity with Ari Halpern, stating that Indigenous women are paid significantly less than male counterparts. This constitutes protected activity under the Equal Pay Act and the Alaska Human Rights Act, AS 18.80.220.

52. On October 2, 2025 — the very next morning — Defendant Lang confronted Plaintiff with hostility, claiming Plaintiff had "offended" people and behaved inappropriately, in direct and immediate retaliation for Plaintiff's protected discussion of wage inequity the previous day.

53. On October 2, 2025, Plaintiff resigned only from her voluntary, unpaid Vice President role — she did NOT resign her paid contractor role. Defendants subsequently mischaracterized this partial resignation as a full departure from the organization, wrongly invoking Board Member removal procedures under XKKF Bylaws Article VII, Section 1.6 to purport to terminate Plaintiff's entirely separate contractor role.

54. On October 2, 2025, another XKKF contractor disclosed to Plaintiff that her confidential wage information had been improperly discussed — a breach of confidentiality that compounded the hostile environment.

55. On October 2–3, 2025, Plaintiff messaged board member Robert Yates about the retaliation. Yates responded supportively in Haida: "Wahhaa!" (meaning "That's not right / that's bullshit"), "Ja wahhaa!" (meaning "That's REALLY not right / serious bullshit"), and "Gin isgyáan uu!" (meaning "My goodness!"), validating Plaintiff's experience and expressing no concerns about her conduct. (See Exhibit G, attached hereto.)

56. On October 6, 2025, Plaintiff began teaching under the new contract, fulfilling all duties as scheduled.

57. On October 8, 2025, Plaintiff sent a detailed written letter to XKKF documenting the retaliation, clarifying that she had never resigned her contractor role, and describing feeling unsafe.

58. The close temporal proximity between Plaintiff's October 1, 2025 protected activity and the retaliatory confrontation the very next morning — October 2, 2025 — is direct and compelling evidence of a causal connection. Retaliation occurring within hours of protected activity is among the strongest possible evidence of unlawful retaliation.

K. The Termination Letter — Procedurally Defective and Retaliatory

59. In late 2025, XKKF issued a two-page termination letter to Plaintiff. The letter was signed by Treasurer Doreen Witwer and President Wendy K'ah Skáahluwaa Todd. It demanded repayment from Plaintiff and threatened legal action if the repayment was not made. (See Exhibit O, XKKF Demand Letter, attached hereto.)

59a. Notably, the termination letter's repayment demand reflects XKKF's own internal recordkeeping errors. The letter demanded repayment of $5,000 and threatened suit for $10,000 — figures that do not correspond to the actual $6,000 contract executed by the parties on September 30, 2025 (See Exhibit I). Plaintiff's executed contract clearly reflects a total compensation amount of $6,000.00. XKKF's use of the wrong contract figures — $5,000 for repayment and $10,000 as a threatened judgment — demonstrates that the repayment demand was not based on an accurate review of the actual contractual arrangement and undermines the credibility of the entire termination rationale. These numerical errors are consistent with the retaliatory nature of the demand: it was issued hastily, without review of the governing contract, as a financial pressure tactic to punish Plaintiff for asserting her rights.

60. Only page 2 of the termination letter was provided to Plaintiff. Page 1 — which purportedly contained the stated reasons for termination — was never delivered. Plaintiff therefore never received a full, written explanation of the grounds for her termination, in direct violation of the notice requirements of XKKF's own bylaws.

61. Page 2 of the letter cites XKKF Bylaws Article VII, Section 1.6, which governs the removal of Board Members — not the termination of independent contractors. By October 2, 2025, Plaintiff had already voluntarily resigned her Board Member (Vice President) role. The invocation of Board Member removal procedures to terminate a separate, independent contractor relationship was legally improper and inapplicable.

62. XKKF's own bylaws require the following procedural protections before any Board Member removal:

   a. Advance written notice of at least ten (10) days prior to any removal vote;

   b. A statement of the reasons for removal included in the notice;

   c. The opportunity for the affected individual to submit a written statement in her defense before any vote is taken;

   d. An affirmative vote of an absolute majority of the full board.

63. None of these protections were afforded to Plaintiff. No advance written notice was provided. No complete statement of reasons was delivered (page 1 of the letter was withheld). No opportunity to respond was given. There is no evidence that a compliant board vote was ever conducted.

64. The repayment demand — issued under threat of legal action — was issued after Plaintiff had already begun teaching under the September 30, 2025 contract and after she had submitted her formal written retaliation complaint on October 8, 2025. This sequence establishes the retaliatory nature of the demand: it was a financial weapon deployed to punish Plaintiff for asserting her rights, not a good-faith contractual claim.

L. XKKF's Own Conflict of Interest Policy Authorized Plaintiff's Contractor Role

65. On November 9, 2023, Plaintiff executed XKKF's Conflict of Interest Disclosure Statement, disclosing no conflicts of interest and certifying full compliance with XKKF's governing policies. (See Exhibit K, attached hereto.)

66. XKKF's own Conflict of Interest Policy expressly permits Board Members to perform discrete contracted services for XKKF when arranged by the Executive Director — the precise arrangement under which Plaintiff served as both a Board Member (Vice President) and a contracted language instructor simultaneously. XKKF's own governing documents therefore expressly authorized and contemplated Plaintiff's dual role.

67. Plaintiff's contractor role was fully compliant with XKKF's own policies. She disclosed no conflicts, complied with all reporting requirements, and served the organization faithfully in both capacities.

68. By contrast, XKKF failed to follow its own bylaws and due process requirements when terminating Plaintiff's contractor role. The same policies that Plaintiff scrupulously observed were disregarded by XKKF leadership in effecting Plaintiff's termination — a termination that was pretextual, retaliatory, and procedurally defective under XKKF's own governing documents.

69. Defendants cannot simultaneously invoke organizational policy to justify disparate pay while ignoring that same policy's due process requirements when terminating the person who complained about that disparity.

M. Stephanie Verlaine Ravana — Coordination Between Lang's Daughter and XKKF

70. Stephanie Verlaine Ravana (also known as "Vee") ("Ravana") served as XKKF's communications contractor at all times relevant to this action. Ravana is the daughter of Defendant Lisa Ka'iljuus Lang.

71. In approximately October 2025, when Plaintiff raised concerns about unequal compensation between herself and a male instructor performing substantially similar work, Ravana — acting in her capacity as an XKKF contractor and as the daughter of the Executive Director — told Plaintiff that "it wasn't the right time to negotiate" her contract. This statement functioned to discourage Plaintiff from asserting her protected right to equal pay, and was made by a person with direct family ties to the decision-maker who ultimately terminated Plaintiff's contract.

72. On October 2, 2025 — the same day Plaintiff received retaliatory confrontation from Defendant Lang — Ravana made a deeply harmful and exclusionary statement to Plaintiff at the home of Mike Jones in Kasaan, Alaska, in the presence of Ravana's aunt Sandi Granberry (Lang's sister), stating: "You're not from Hydaburg, so stop saying that." This statement was made with full knowledge that Plaintiff was unable to reside in Hydaburg due to a family safety situation involving physical violence — circumstances beyond Plaintiff's control. The statement was calculated to alienate Plaintiff from her own ancestral land and Indigenous community, and was made by a person directly connected to XKKF leadership. Following this exchange, Plaintiff felt so unsafe and distressed that she walked approximately seven miles out of Kasaan alone on a dirt road — a physical manifestation of the severe emotional harm caused by Ravana's conduct and

73. The family relationship between Ravana and Defendant Lang, combined with Ravana's role as an XKKF contractor, supports an inference that the hostility directed at Plaintiff was coordinated within XKKF leadership. Notably, Defendant Lang's retaliatory confrontation on the morning of October 2, 2025 — the morning after Plaintiff's protected activity — preceded Ravana's exclusionary statement. This sequence — Defendant Lang retaliating first, followed by Ravana's hostile and alienating conduct — reflects a pattern of coordinated suppression of Plaintiff's protected rights extending across multiple individuals connected to XKKF leadership.

74. These acts by Ravana are relevant to the hostile work environment, retaliation, and damages claims in this action. They reflect the broader organizational culture at XKKF in which Plaintiff's Indigenous identity, her connection to her ancestral community, and her protected wage complaints were weaponized against her by individuals connected to XKKF leadership.

N. EEOC Proceedings

75. Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") based on the acts described herein. Through the EEOC intake process, Plaintiff dual-filed or attempted to dual-file with the Alaska State Commission for Human Rights, as the EEOC maintains a work-sharing agreement with the Alaska State Commission for Human Rights under which charges filed with the EEOC are cross-filed with the state agency.

76. The EEOC Seattle Field Office issued a Notice of Right to Sue. A copy of the Right to Sue letter is attached as Exhibit B. This Complaint is filed within ninety (90) days of Plaintiff's receipt of the Right to Sue notice.

77. Note: For Plaintiff's Equal Pay Act claims, no EEOC charge or Right to Sue letter is required prior to filing suit. Plaintiff brings the EPA claim directly pursuant to 29 U.S.C. § 216(b).

VI. CAUSES OF ACTION

COUNT I — VIOLATION OF THE EQUAL PAY ACT

29 U.S.C. § 206(d)

(Against Defendant XKKF)

78. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

79. The Equal Pay Act prohibits employers from paying employees of one sex less than employees of the opposite sex for equal work on jobs requiring equal skill, effort, and responsibility, performed under similar working conditions.

80. Plaintiff and her male comparator Ryan Kessler both taught Haida language classes for XKKF under contract, both were paid from the same Sealaska Heritage Institute Language Revitalization Grant, and both reported to the same supervisory structure under Executive Director Lang and President Todd. The nature, purpose, and organizational context of their contracted work was substantially identical: teaching the Xaad Kil language to students within XKKF's programming framework. Plaintiff's work required equal — and in several respects greater — skill, effort, and responsibility compared to Kessler's, given Plaintiff's additional curriculum development deliverables, community outreach duties, and website technical support obligations that were not required of Kessler.

81. At all relevant times, Plaintiff was an employee of XKKF within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 203(e), as established by the economic reality of the employment relationship.

82. Plaintiff performed teaching work requiring similar skill, effort, and responsibility under similar working conditions as a male instructor who was compensated at a higher rate, within the same establishment (XKKF).

83. Both Plaintiff and the male comparator performed language instructor duties for XKKF, funded by the same Sealaska Language Fund grant budget allocating $10,000 for the instructor position.

84. Plaintiff was paid $6,000 while the male comparator received $10,000 — a pay disparity of $4,000, representing 40% less than the male comparator. Plaintiff and the male comparator performed substantially equal work requiring equal skill, effort, and responsibility, and the work was performed under similar working conditions within the meaning of the Equal Pay Act, 29 U.S.C. § 206(d). The jobs need not be identical, only substantially equal — and here, both Plaintiff and Kessler performed the same core function: teaching Xaad Kil to students under the same grant, for the same organization, under the same supervisory structure.

85. Plaintiff holds four completed academic degrees and certificates in Xaad Kil and related fields, including: (i) a Master of Arts in Linguistics of a First Nations Language from Simon Fraser University (2019), with a thesis focused on Xaad Kil resources for babies; (ii) a Graduate Certificate in Field Methods in Linguistics; (iii) a Graduate Certificate in Documentation and Description of Endangered Languages; (iv) a Certificate in Haida Language from the University of Alaska Southeast; and (v) she is currently completing a Doctor of Philosophy in Indigenous Studies at the University of Alaska Fairbanks, with a doctoral dissertation focused on Xaad Kil

Case 3:26-cv-00135-ACP    Document 1    Filed 05/24/26    Page 22 of 36

86. None of the EPA's four statutory affirmative defenses applies to this pay disparity. The disparity is not the result of: (i) a seniority system — even if Kessler had longer organizational tenure, seniority does not justify a 40% pay disparity; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production — Plaintiff performed more work, not less; or (iv) a differential based on any factor other than sex. Plaintiff performed superior work, brought superior qualifications, attended events Kessler did not attend, and was formally recognized by XKKF itself in May 2025. The disparity cannot be explained by seniority, merit, quantity or quality of production, or any factor other than sex — the statutory affirmative defenses set forth in 29 U.S.C. § 206(d)(1).

87. Defendants' violation of the EPA was willful, as Defendant Lang explicitly made the comparison to the male comparator's pay while simultaneously offering Plaintiff less, demonstrating full awareness of the disparity.

88. As a direct and proximate result of Defendants' violation of the EPA, Plaintiff has suffered damages including lost wages, back pay, unreimbursed out-of-pocket expenses, and liquidated damages in an amount to be proven at trial. The documented damages are as follows:

   a. Spring 2025: Plaintiff was paid $5,000 while male comparator Kessler received, upon information and belief, $10,000 — a disparity of $5,000;

   b. Fall 2025: Plaintiff was paid $6,000 while male comparator Kessler received, upon information and belief, $10,000 — a disparity of $4,000;

   c. Unreimbursed Canva subscription expenses: Plaintiff personally paid for a Canva subscription used exclusively to create XKKF instructional materials, including books, video resources, and class posters. Documented payments from September 2024 through March 2025 total $284.97 (seven transactions: six monthly charges of $15.00 each plus one annual renewal of $120.00), for which Plaintiff received no reimbursement. The male comparator bore no comparable out-of-pocket expense.

The total documented actual damages are no less than $9,284.97 ($5,000 + $4,000 = $9,000 in wage disparity across the two documented 2025 contract periods, plus $284.97 in unreimbursed Canva expenses). Pursuant to 29 U.S.C. § 216(b), Plaintiff is entitled to an equal amount in liquidated damages, bringing total damages to no less than $18,569.94 (actual damages $9,284.97 × 2). Additional contract periods in which disparate pay occurred, and additional unreimbursed expenses, may be established through discovery.

## COUNT II — SEX DISCRIMINATION IN VIOLATION OF THE ALASKA HUMAN RIGHTS ACT
Alaska Statute § 18.80.220
(Against All Defendants)

89. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

90. The Alaska Human Rights Act, AS 18.80.220, prohibits employers from discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment because of that individual's sex. Unlike Title VII, the Alaska Human Rights Act applies to employers regardless of the number of employees, making it fully applicable to XKKF.

91. At all relevant times, XKKF was an employer within the meaning of the Alaska Human Rights Act, AS 18.80.300(6), which defines "employer" to include any person or organization that employs one or more persons in the State of Alaska.

92. At all relevant times, Plaintiff performed services for XKKF within the meaning of the Alaska Human Rights Act.

93. XKKF intentionally discriminated against Plaintiff on the basis of her sex (female) by: (a) paying her significantly less than a male comparator for equal work; (b) offering justifications for the disparity that were pretextual; and (c) allowing a hostile and demeaning environment in which Plaintiff's professional value was systematically minimized compared to her male counterpart.

93a. As a threshold matter, XKKF's own Articles of Incorporation, Article XIV, expressly prohibit discrimination in employment, providing that no person shall be excluded from or discriminated against with respect to employment by XKKF. By compensating Plaintiff at rates materially lower than her male comparators for substantially equal work, Defendants violated not only Alaska's Human Rights Act but also XKKF's own foundational governing documents. This internal prohibition against discrimination reflects XKKF's voluntary and independent commitment to equal employment — a commitment its officers and directors knowingly disregarded. (See Exhibit N, XKKF Articles of Incorporation, Article XIV.)

94. Defendant Lang's statement that Kessler would teach for free and teaches double the hours was a discriminatory pretext designed to suppress Plaintiff's compensation on the basis of her sex.

95. Individual Defendants Lang, Todd, and Witwer exercised operational control over compensation decisions and employment conditions at XKKF, and are individually liable under AS 18.80.220 as persons who aided, abetted, incited, compelled, or coerced the unlawful discriminatory practices alleged herein.

96. As a direct and proximate result of Defendants' violations of the Alaska Human Rights Act, Plaintiff has suffered and continues to suffer damages including lost wages, lost professional opportunities, emotional distress, and harm to professional reputation, entitling Plaintiff to compensatory and punitive damages under AS 18.80.300 et seq.

WHEREFORE as to Count II, Plaintiff respectfully requests that this Court enter judgment in her favor and against all Defendants, and award compensatory damages, punitive damages, attorney's fees, costs, and such other relief as set forth in the Prayer for Relief below.

## COUNT III — RETALIATION UNDER THE FLSA AND AKHRA
(Against All Defendants)

109. Plaintiff realleges and incorporates all preceding paragraphs.

110. Plaintiff engaged in protected activity under 29 U.S.C. § 215(a)(3) and AS 18.80.220 by: (a) complaining to XKKF Board President Wendy Todd about unequal pay in September 2025; (b) during a personal conversation with Arielle Halpern at an XKKF-sponsored event in Kasaan, Alaska on October 1, 2025, Halpern made a joke about Plaintiff earning "seventy cents on the dollar," to which Plaintiff, visibly emotional, responded: "It was actually sixty cents on the dollar — with an opening offer of fifty cents on the dollar." This candid, personal disclosure of the pay disparity Plaintiff had experienced constitutes protected activity — an assertion of her rights under the Equal Pay Act and the Alaska Human Rights Act — not a formal grievance or public statement, but a truthful account of her lived experience of wage discrimination; and (c) filing a charge of discrimination with the Equal Employment Opportunity Commission.

111. Within hours of Plaintiff's protected activity on October 1, 2025, Defendant Lang issued a termination letter on October 2, 2025, stripping Plaintiff of her teaching and website duties, canceling all compensation, and threatening legal action — constituting swift and direct retaliation.

112. The temporal proximity between Plaintiff's protected activity and Defendants' adverse actions establishes a causal nexus sufficient to support a retaliation claim.

113. As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has suffered and continues to suffer lost income, damage to professional reputation, emotional distress, and other compensable harm.

WHEREFORE as to Count III, Plaintiff respectfully requests that this Court enter judgment in her favor and against all Defendants, and award back pay, compensatory damages, liquidated damages, injunctive relief, attorney's fees, costs, and such other relief as set forth in the Prayer for Relief below. — RETALIATION

29 U.S.C. § 215(a)(3) (FLSA anti-retaliation provision) and AS 18.80.220 (Alaska Human Rights Act)

(Against All Defendants)

97. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

98. Both the Equal Pay Act and the Alaska Human Rights Act prohibit retaliation against an employee who has engaged in protected activity, including complaining about unlawful pay discrimination. AS 18.80.220(a)(4) expressly prohibits retaliating against any person who has opposed unlawful discriminatory practices.

99. Plaintiff engaged in protected activity on October 1, 2025, when she discussed wage inequity with Ari Halpern at an XKKF-sponsored event in Kasaan, stating that Indigenous women are paid significantly less than their male counterparts. This constitutes protected activity under the Equal Pay Act and the Alaska Human Rights Act, AS 18.80.220.

100. Following Plaintiff's protected complaint, Defendants took materially adverse employment actions against Plaintiff, including but not limited to:

a. Labeling Plaintiff as "rude" and claiming she "offended multiple people" in direct response to her protected complaint;

b. Failing to remedy or even meaningfully investigate the pay disparity despite Defendant Todd's stated intent to do so, and then signing a retaliatory termination letter demanding repayment from Plaintiff;

c. Taking actions that made Plaintiff's continued relationship with XKKF untenable, constituting constructive discharge;

d. Issuing a demand for repayment under threat of legal action — a retaliatory financial threat issued after Plaintiff had already begun performing under her contract and had filed a formal written complaint of retaliation.

101. There is a direct causal connection between Plaintiff's protected activity and the adverse actions taken against her. The retaliatory actions occurred within hours of Plaintiff's protected complaint, establishing unusually strong temporal proximity between protected activity and adverse action — the very next morning after Plaintiff's October 1, 2025 protected discussion. Defendants were aware of Plaintiff's protected activity at the time they took the adverse actions: Defendant Lang's retaliatory confrontation on the morning of October 2, 2025 expressly referenced the prior day's events, confirming that Lang knew of Plaintiff's protected activity and acted in direct response to it. Further, on October 2, 2025, Stephanie Verlaine Ravana — XKKF's communications contractor and Defendant Lang's daughter — spontaneously referenced the details of Plaintiff's contract in conversation, despite the fact that Plaintiff had made no mention of her contract whatsoever during that interaction. This unsolicited disclosure confirms that Defendants, as a group, had been actively discussing Plaintiff's contract and compensation in direct response to her protected activity — evidence of coordinated organizational awareness of Plaintiff's protected conduct, not isolated individual knowledge. Defendants employed the characterization of Plaintiff as "rude" and having "offended people" — language designed to suppress protected complaints about wage inequity. Board member Robert Yates' supportive Haida-language responses ("Wahhaa!" and "Ja wahhaa!") further confirm that Plaintiff's conduct was not inappropriate and that the retaliation was unjustified.

102. The adverse actions taken against Plaintiff occurred shortly after Plaintiff raised concerns regarding unequal pay and discrimination. The close temporal proximity between Plaintiff's protected activity and Defendants' retaliatory conduct supports a reasonable inference that the adverse actions were motivated by retaliation.

103. As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has suffered damages including lost income, lost professional opportunities, emotional distress, and damage to her professional reputation.

COUNT IV — UNPAID WAGES IN VIOLATION OF THE FAIR LABOR STANDARDS ACT
29 U.S.C. §§ 206-207

(Against Defendant XKKF)

104. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

105. The Fair Labor Standards Act, 29 U.S.C. § 206, requires covered employers to pay employees at least the federal minimum wage for all hours worked. 29 U.S.C. § 207 requires employers to pay overtime compensation for hours worked in excess of forty (40) per week.

106. As set forth above, Plaintiff performed substantial work for XKKF during July, August, and September 2025 without any contract, agreement, or compensation. This work included bi-weekly organizational meetings held every Tuesday and Thursday evening for approximately two hours per session, as well as three days of community outreach at the Hydaburg Culture Camp on August 15, 16, and 17, 2025.

107. It was the common practice and organizational expectation at XKKF for contractors to perform work prior to executing formal contracts. XKKF knowingly suffered and permitted Plaintiff to perform this work, accepting its full benefit without compensation.

107a. The off-contract labor performed by Plaintiff directly and substantially benefited XKKF within the meaning of the Fair Labor Standards Act. Specifically: (i) Plaintiff's recruitment activities at the Hydaburg Culture Camp on August 15–17, 2025 enrolled new students in XKKF's upcoming class session, directly expanding XKKF's program reach and justifying the grant-funded program to the Sealaska Language Fund; (ii) Plaintiff's participation in bi-weekly Tuesday and Thursday organizational meetings — coordinating curriculum, materials, and program structure with co-instructor Kessler — was essential to XKKF's ability to launch and conduct the Fall 2025 language program; (iii) Plaintiff distributed XKKF language materials created using her own Canva subscription to community members at Culture Camp, fulfilling XKKF's core programmatic mission; and (iv) Plaintiff enrolled community members in XKKF's Naana's Club, directly building the organization's membership base and demonstrating program impact to funders.

107b. Under the FLSA, an employer "suffers or permits" work — and thereby incurs wage liability — when it knows or has reason to believe that work is being performed and fails to prevent it. See 29 C.F.R. § 785.11. XKKF leadership was fully aware that Plaintiff was attending organizational meetings, participating in Culture Camp, distributing materials, and recruiting students during the July–September 2025 off-contract period. XKKF took no steps to stop this work. To the contrary, XKKF accepted and incorporated the direct fruits of Plaintiff's labor — enrolled students, distributed materials, expanded community presence — into its funded program. XKKF cannot accept the benefits of Plaintiff's off-contract labor while refusing to compensate her for it. The economic reality of this arrangement establishes XKKF's FLSA liability for all hours Plaintiff worked off-contract.

108. Plaintiff performed approximately 70 or more hours of uncompensated labor during this three-month off-contract period, including:

a. Approximately sixteen (16) hours of organizational meetings in July 2025;

b. Approximately sixteen (16) hours of organizational meetings in August 2025;

c. Approximately eighteen (18) to twenty-four (24) hours of community outreach at the Hydaburg Culture Camp, August 15–17, 2025;

d. Approximately eight (8) hours of organizational meetings throughout September 2025 (approximately four meetings through September 30, 2025).

109. XKKF's failure to compensate Plaintiff for these hours — while Defendant Kessler, the male comparator who attended the same meetings, ultimately received a contract for $10,000 — constitutes a violation of the FLSA's minimum wage and compensation requirements.

110. XKKF's violation of the FLSA was willful. XKKF knew that Plaintiff was performing work during the off-contract period, accepted and benefited from that work, and then offered Plaintiff 50% of the compensation offered to the male comparator who performed the same meetings.

111. As a direct and proximate result of XKKF's FLSA violations, Plaintiff is entitled to recover unpaid wages for all hours worked off-contract, plus an equal amount in liquidated damages, plus attorney's fees and costs pursuant to 29 U.S.C. § 216(b). The precise amount of Plaintiff's damages will be determined through discovery and proven at trial.

WHEREFORE as to Count IV, Plaintiff respectfully requests that this Court enter judgment in her favor and against all Defendants, and award all unpaid wages, liquidated damages equal to the unpaid wages, attorney's fees, costs, and such other relief as set forth in the Prayer for Relief below.

## VII. DAMAGES

112. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer the following damages:

a. Back pay and lost wages in an amount to be proven at trial, including the $4,000 pay disparity between Plaintiff's $6,000 compensation and the male comparator's $10,000 compensation under the Sealaska grant;

b. Unpaid wages for approximately 70 or more hours of off-contract labor performed during July, August, and September 2025. Plaintiff was a uniquely qualified professional linguist working with Xaad Kil, a critically endangered language with fewer than 5 known remaining speakers. Plaintiff holds graduate-level academic credentials in linguistics, is completing a doctoral dissertation focused on Xaad Kil, and has been recognized by Dr. Alice Taff — a specialist in Southeast Alaska Indigenous languages — as the world's leading expert on Xaad Kil. The appropriate measure of unpaid wages for a contractor of Plaintiff's qualifications is the

The prevailing market rate for linguists and language instructors with Plaintiff's specialized credentials — particularly those working with critically endangered Indigenous languages in grant-funded programs — ranges from $75.00 to $200.00 per hour, depending on experience, language scarcity, and the nature of the work. Grant-funded endangered language programs routinely budget instructor compensation at or above this range.

Plaintiff presents the following alternative calculations, from most conservative to full market value:

(i) At Plaintiff's own pro-rated contracted rate ($6,000 ÷ 240 hours = $25.00/hour) — which itself significantly undervalues Plaintiff's expertise but represents the floor of any reasonable damages calculation: 70 hours × $25.00 = $1,750.00 in unpaid wages.

(ii) At the Alaska state minimum wage (absolute statutory floor): 70 hours × the applicable Alaska minimum wage = minimum floor damages.

(iii) At a conservative market rate of $75.00/hour, consistent with rates for credentialed linguists in grant-funded programs: 70 hours × $75.00 = $5,250.00 in unpaid wages.

(iv) At the full market rate of $200.00/hour, consistent with Plaintiff's four completed academic degrees and certificates, 22+ years of Xaad Kil study, doctoral-level credentials, irreplaceable expertise as the only person raising a first-language fluent speaker of Xaad Kil, and the expert academic recognition she has received from Dr. Alice Taff at the University of Alaska Fairbanks: 70 hours × $200.00 = $14,000.00 in unpaid wages.

Plaintiff is entitled to compensation at a rate that reflects the actual market value of her specialized services. The precise amount will be proven at trial, including through expert testimony regarding the market rate for linguists working with critically endangered languages;

c. Liquidated damages pursuant to 29 U.S.C. § 216(b) for violations of the Equal Pay Act and the Fair Labor Standards Act. Under both provisions, willful violations entitle Plaintiff to liquidated damages equal to the amount of unpaid wages and the wage differential;

d. Unreimbursed business expenses, including but not limited to travel costs (Amtrak and lodging) incurred during Plaintiff's June 12–17, 2025 trip to the Lummi Nation on behalf of XKKF;

e. Compensatory damages for emotional distress, pain, and suffering;

f. Compensatory damages for harm to professional reputation and loss of future professional opportunities within the Haida language instruction community;

g. Punitive damages against all Defendants for intentional sex discrimination in violation of the Alaska Human Rights Act, AS 18.80.220;

h. Front pay in lieu of reinstatement. Reinstatement is not practicable in this case because: (i) Plaintiff's working relationship with Defendant Lang — the Executive Director who personally retaliated against Plaintiff — has been irreparably damaged; (ii) Defendant Lang and other XKKF leadership remain in place and would directly supervise Plaintiff; (iii) the hostile environment created by Defendants, including exclusionary conduct by individuals connected to XKKF leadership, has rendered any continued working relationship untenable; and (iv) the small size of the organization makes working alongside the same individuals who orchestrated Plaintiff's termination impracticable and harmful. Courts in this Circuit recognize that front pay is an appropriate remedy where workplace hostility makes reinstatement impracticable. See Cassino v. Reichhold Chemicals, Inc., 817 F.2d 1338, 1347 (9th Cir. 1987). Front pay damages shall be calculated based on the difference between Plaintiff's projected XKKF earnings and her expected future earnings in comparable work, for a period to be determined at trial;

i. Attorney's fees and costs pursuant to 29 U.S.C. § 216(b), AS 18.80.130, and other applicable law; and

j. Such other and further relief as this Court deems just and proper.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Emily Edenshaw-Chafin respectfully requests that this Court:

1. Enter judgment in favor of Plaintiff and against all Defendants on all counts;

2. Award Plaintiff back pay and lost wages equal to the difference between Plaintiff's compensation and the male comparator's compensation across all documented contract periods, including a documented wage disparity of $5,000 for the Spring 2025 contract period and $4,000 for the Fall 2025 contract period, totaling no less than $9,284.97 in actual wage damages (plus an equal amount in liquidated damages under 29 U.S.C. § 216(b)), with the full amount of damages for all contract periods to be determined through discovery and proven at trial;

3. Award Plaintiff unpaid wages under the FLSA for approximately 70 or more hours of off-contract labor performed during July, August, and September 2025;

4. Award Plaintiff liquidated damages pursuant to 29 U.S.C. § 216(b) for violations of the Equal Pay Act and the Fair Labor Standards Act;

5. Award Plaintiff compensatory damages for emotional distress, reputational harm, and lost professional opportunities in an amount to be determined at trial;

6. Award Plaintiff reimbursement for unreimbursed business expenses, including travel costs incurred during the June 12–17, 2025 Lummi Nation trip;

7. Award Plaintiff punitive damages against all Defendants for intentional sex discrimination in violation of the Alaska Human Rights Act, AS 18.80.220;

8. Award Plaintiff attorney's fees and costs pursuant to 29 U.S.C. § 216(b), AS 18.80.130, and other applicable law;

9. Issue such injunctive relief as the Court deems appropriate, including an order requiring XKKF to implement equitable pay practices;

10. Award Plaintiff pre- and post-judgment interest at the applicable rate;

11. Award Plaintiff the precise amount of all damages to be determined through discovery and proven at trial; and

12. Grant Plaintiff such other and further relief as this Court deems just and proper.

## IX. JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Emily Edenshaw-Chafin hereby demands a trial by jury on all issues so triable.

## EXHIBITS

Exhibit A – Facebook post by Alex Mae (December 2, 2025) stating "We love our snuggles in the morning and our Xaad Kil on the weekends" — confirming Plaintiff was actively teaching as contracted (¶39)

Exhibit B – EEOC Right to Sue Letter, Case No. NRTS-551-2026-01192, dated January 15, 2026

Exhibit C – Sealaska Language Fund RFP reflecting XKKF's $10,000 budget for the language instructor position

Exhibit D – "Tracing Tláng Glaláang náay aa" — Haida language educ by Plaintiff Kihl Gúul Jáad Edenshaw-Chafin on April 18, 2024 under contract with XKKF (¶43a)

Exhibit E – XKKF website Offerings page showing Kids Corner with Plaintiff's resource still publicly posted as of date of filing (¶43a) (https://xkkf.org/offerings)

Exhibit F – Photograph of Plaintiff staffing XKKF table at Hydaburg Culture Camp, August 15–17, 2025

Exhibit G – Plaintiff's Facebook Messenger messages to Board Member Robert Yates documenting her concerns about retaliation and unequal pay (¶55)

Exhibit H – Reference letter by Executive Director Lisa Ka'iljuus Lang praising Plaintiff's qualifications

Exhibit I – XKKF Contract with Plaintiff Emily Edenshaw-Chafin, Spring 2025 ($5,000, January–June 2025)

Exhibit J – XKKF Contract with Ryan Kessler ($10,000)

Exhibit K – XKKF Conflict of Interest Disclosure Statement signed by Plaintiff, November 9, 2023 (¶65)

Exhibit L – Curriculum Vitae of Plaintiff Emily Edenshaw-Chafin (Kihl Gúul Jáad)

Exhibit M – Canva subscription receipts documenting $284.97 in unreimbursed out-of-pocket expenses for XKKF instructional materials (September 2024 – March 2025)

Exhibit N – XKKF Articles of Incorporation (Document No. 348519), Article XIV — Discrimination Prohibited (¶1f, ¶93a)

Exhibit O – XKKF Demand Letter signed by President Wendy K'ah Skáahluwaa Todd and Treasurer Doreen Witwer, demanding repayment and threatening legal action — issued after Plaintiff began performing under her September 30, 2025 contract and after she filed her written retaliation complaint (¶59, ¶64)

Exhibit P – Wendy K'ah Skáahluwaa Todd Facebook post announcing XKKF's receipt of Sealaska Language Fund grant (April 23, 2025) — corroborates Plaintiff's role in securing the grant and XKKF's receipt of funds during Plaintiff's tenure

Exhibit Q – Email exchange between Plaintiff and XKKF documenting the $10,000 vs. $6,000 pay disparity dispute — establishes Plaintiff's contemporaneous written notice of unequal compensation

Exhibit R – XKKF Board Meeting Minutes, July 2025 — documents board approval of Ryan Kessler's $10,000 compensation and Plaintiff's $6,000 compensation for the same grant-funded period

Exhibit S – Additional Facebook Messenger conversations with Robert Yates (Parts 2 and 3) — corroborates hostile work environment and retaliatory conduct by Lang toward contractors who supported Plaintiff

Exhibit T – Alaska Division of Corporations record (March 16, 2026) listing Emily Edenshaw-Chafin as Director and Vice President of XKKF — confirms Plaintiff's formal leadership role and the authorized dual role expressly permitted by XKKF's own Conflict of Interest Policy (¶5a, ¶66)

Exhibit U – XKKF IRS Form 990, Tax Years 2023 and 2024 — documents XKKF's financial capacity to pay Plaintiff equal compensation and corroborates pay disparity between Plaintiff and male comparators

Exhibit V – XKKF Termination Letter to Plaintiff — establishes adverse employment action, documents procedurally defective termination, and corroborates retaliatory discharge following Plaintiff's protected activity

Respectfully submitted,

Emily Edenshaw-Chafin

Plaintiff, Pro Se

P.O. Box 106

Hydaburg, Alaska 99922

907-723-7081

emilyedenshaw@hotmail.com

DATED: March 18, 2026

Signature: *Emily Edenshaw-Chafin*
Emily Edenshaw-Chafin

---

## CERTIFICATE OF SERVICE

I hereby certify that on _____, 2026, I served a true and correct copy of the foregoing Complaint and all attachments upon the following parties by the method indicated:

Defendant XKKF (Xaadas Kil Kuyaas Foundation)
c/o Doreen Witwer, Registered Agent
One Main Street (physical)
P.O. Box 25 (mailing)
Hydaburg, Alaska 99922
[ ] U.S. Mail, First Class, Postage Prepaid
[ ] Personal Service
[ ] Certified Mail, Return Receipt Requested

Defendant Lisa Ka'iljuus Lang
One Postal Way, Hydaburg, AK 99922
Hydaburg, Alaska 99922
[ ] U.S. Mail, First Class, Postage Prepaid
[ ] Personal Service
[ ] Certified Mail, Return Receipt Requested

Defendant Wendy K'ah Skáahluwaa Todd
c/o University of Alaska Southeast
11120 Glacier Highway
Juneau, Alaska 99801
(Term Assistant Professor of Indigenous Science — official work address)
OR Personal address to be confirmed upon service
[ ] U.S. Mail, First Class, Postage Prepaid
[ ] Personal Service
[ ] Certified Mail, Return Receipt Requested

Defendant Doreen Witwer
One Main Street (physical)
P.O. Box 25 (mailing)
Hydaburg, Alaska 99922
[ ] U.S. Mail, First Class, Postage Prepaid
[ ] Personal Service
[ ] Certified Mail, Return Receipt Requested

_____

Emily Edenshaw-Chafin

Plaintiff, Pro Se